Good morning, Your Honors, and may it please the Court. The record before you documents Forest Service professionals trying to do their jobs. As they evaluated a proposed pipeline through two national forests, they were testing the project against the governing forest plans and planning rule. They demanded full evaluation of alternatives that would have avoided the for an engineering solution to the serious erosion and landslide hazards that characterize the forest. The record tells a consistent story of problems and legal violations Atlantic failed or refused to address. Then suddenly, the agency reversed course and abandoned its well-founded objections. Agencies can change their minds, but they must do so based on explanation for the change. Nothing changed in this project or the agency's analysis of it to explain these reversals. Petitioners have raised three sets of claims related to the Forest Service's planning rule, routing alternatives and statutory authority, and landslide and erosion hazards. Several of those claims have been decided now and are on all fours of this Court's decision with respect to the Forest Service authorization for the Mountain Valley Pipeline. I'll address each in turn subject to the Court's questions. Turning first to the planning rule argument, the Forest Service here, as it did for the Mountain Valley Pipeline, amended its forest plans to exempt the project from protective standards in its forest plans for soil, water quality, and rare species. Now, as the Court knows, it must... When I was reading through all this, I was having serious déjà vu. I think I've heard this before. Can you, in Sierra Club v. Forest Service, can you speak to how that case might impact this case? Yes, Your Honor. This case is on all fours with the Court's decision in that case. First, this is just some context. These two forests, the Jefferson National Forest and the George Mountain Unit, by the same staff. They are governed by separate forest plans that have a lot of overlap. Some of the same standards amended are identical, and they were amended with the same approach, exempting the pipeline from meeting them if it complied with promised mitigation. The agency's reasoning was the same. In both cases, it skipped over the purpose test entirely, this test for determining whether the amendment is directly related. In the Court's decision for the Mountain Valley Pipeline case, the Court noted that the record of decision in that case, which was drawn from the same template as the record of decision here, stated that the amendments were needed to ensure consistency between provisions of the forest plan and the proposal. A nearly identical statement is in the record of decision for the Atlantic Coast Pipeline, where the Court says, and this is at page 37 of the project, with the provisions of the two forest plans. The rationale is the same. As the Court reasoned in Mountain Valley Pipeline, there's no need to ensure consistency if the forest plan need not be amended in the first place. The clear purpose of these amendments, as the Mountain Valley Pipeline amendments, is to lessen requirements for the forest plans. The overlap between this case and Mountain Valley Pipeline alone is enough to vacate the four of us' authorization, because it failed to apply the protective standards of its own forest planning rule, and hold these amendments, these exemptions for the pipeline, up to them. We also argued in our brief before the decision came down to Mountain Valley Pipeline that the Forest Service misapplied the effects prior to its test. I won't address that here. However, I will briefly address the Respondent's arguments that this case, in this case, its failure to apply the test faithfully or to apply the purpose test at all, is harmless error. It bases that on two arguments, or they base that on two arguments. One, that the mitigation promised for this project will address it, and I'll talk more about the mitigation later. But the record is clear. This is from the EIS. So, thinking about the amendments to the soil standards in the forest plan. Construction may adversely affect soil resources. So, let me make sure I understand your answer to Judge Thackett's question. Yes, Your Honor. You're saying that the Sierra Club case is on all fours here. Yes, sir. What's different? What is it, then, you're saying that case answers most of the questions in this case, or all of them? Well, I was speaking specifically to one, Your Honor, the plan amendments. But actually, I think it addresses three. Three issues raised in this case are identical. So, one is the plan amendment. Run right down to three, that's right. Tell me what the three are. Yes, sir. So, that's the failure to apply the planning rule, and this plan amendment issue. So, I think that is squarely decided. The second is our contention that the Forest Service failed entirely to consider alternatives that avoid the national forest. Now, as the Court knows, in the Mountain Valley Pipeline case, there was an issue that the Bureau of Land Management had a statutory obligation to consider routes that were co-located with existing rights of way. And it could only issue You're saying Sierra resolved that dispute. That's right. And what the Court found is that the BLM failed entirely to determine whether it was practical, which was the test under the statute, whether it was practical to co-locate. What's the third? And so, that ties to our plan amendment argument, Your Honor. And the third relates to the erosion issue. So, we contend that the Forest Service failed to evaluate the environmental effects of erosion here. They relied on a computer model generated by ACP, just as they relied on a computer model generated by the Mountain Valley Pipeline in that case. In the Mountain Valley Pipeline case, the Court noted that the Forest Service pointed to a predicted efficiency for erosion control measures of 78 percent as vastly overstated. In this case, the Forest Service accepted a model that assumed 96 percent efficiency for a single line of erosion control measures, meaning put up one erosion measure and you're going to assume total effectiveness. That assumed perfect implementation, that construction would proceed in the driest months, and it was from a model that wasn't validated for these steep slopes. So, in your view, resolved by C.R. Club, those three issues. Yes, Your Honor. What's not resolved? So, what's not resolved, not directly answered by C.R. Club, Your Honors, are other arguments related to alternatives and issues related to landslides. So, I'll turn my attention there. So, we contend that the Forest Service failed to apply its own forest plan standards that require it to consider, require, sorry, disallow it from authorizing right-of-way across the forest if other alternatives are available, if it can be accommodated elsewhere. That's the issue we contend is squarely addressed by the Court's decision with respect to BLM and the C.R. Club case. The other alternatives were dismissed based on a conclusion that they offered no significant environmental advantage. It's important here, Your Honor, to note that there is an alternative available that reallocates just 15 miles to the north and avoids all federal land. It would avoid both national forests, the Shenandoah National Park, the Blue Ridge Parkway, and it would cross the Appalachian Trail on private or state-owned land. That alternative was named but dismissed from detailed study on the finding that it would provide no significant environmental advantage. That alternative got three paragraphs of discussion in the EIS. We contend that basis, no significant environmental advantage, was based on pretext. It's based on the assumption that 15 miles longer necessarily means it has more environmental impact. But the agency knew that was wrong. It objected when FERC proposed to drop that alternative, that off-forest alternative. It said miles of line do not equate to environmental impact. You have to look at the resource. You have to determine if more sensitive resources will be impacted. And this isn't hypothetical. The agency already required Atlantic to reroute on a longer path to avoid sensitive resources. Early in the project timeline, Atlantic proposed to cross Shenandoah National Mountain, which had habitat for a rare salamander species on it. Forest Service said you're not going to get approval for there, and that resulted in a 31-mile longer route around Shenandoah Mountain to avoid impact of sensitive resources. That's a longer route with less environmental resources impacts overall, because it was less significant resources. Now you gave us three. You said CRO Club foreclosed. The opponent's probably going to say this one is foreclosed by CRO2. I don't think so, Your Honor. The CRO Club decision presented a different question about alternatives. There, as I understand the question before the court, the parties, the petitioners argued that the Forest Service failed to analyze for itself in the document, in its record decision. It failed to go through all the alternatives and repeat the analysis done in the environmental impact statement that it had adopted. That's not our contention here. It is plain. It's on the face of the environmental impact statement. So FERC, Atlantic named these two alternatives and refused to consider them. And FERC never required them to go back. FERC accepted this assumption that longer is more environmental impact, even though it says, it acknowledges that it's not necessarily true that longer has more environmental impact. And we haven't done resource surveys to figure out if that's the case. But we're going to go ahead and reject them on that assumption. The Forest Service accepted that rationale, notwithstanding that it has an independent obligation under its own forest plans to seek out and confirm that all forest alternatives are not available. It's no question what was really driving that, Your Honor, however. Atlantic and the Respondent's Forest Service point to the fact that Atlantic considered 200 route variations. They're very proud of that. They don't disclose that 198 of those 200 variations went through the same one-mile segment of the Appalachian Trail on the Georgia-Washington National Forest. And the record is clear that that decision severely limited opportunities to avoid federal land, to avoid the national forest. The reason they did that was based on a statutory theory that the Forest Service could do something that the Park Service couldn't, which is to use the Mineral Leasing Act to authorize a right-of-way across a unit of the national park system. This issue, I think, is also partly decided by another decision of the Court, our recent challenge to the National Park Service Authority, where the Court said the Mineral Leasing Act and units of the national park system simply exist in different spheres. This case, our challenge here, is not about what that was about. This is not an issue of whether a federal agency, if it has independent statutory authority authorizing a right-of-way, can use it. The Court's answered that. Here, the Forest Service relies on the Mineral Leasing Act, which denies authority for crossing a unit of the national park system. So that's the only question. Is this a unit of the national park system? And that question is definitively answered by the record, by the Forest Service's own comments. The first letter the Forest Service wrote to FERC about this... Because of the trail aspect of it? One of them looked at that trail as being part of the park, something differently? That's right, Your Honor. So the National Trails Act designates the Appalachian... It was an interesting position, wasn't it? Two different agencies... Taking different positions on the same statutory authority. And in fact, now, in post hoc, taking a different position than they took in the record about whether... So the only question is whether the Appalachian Trail, as it crosses the George Washington National Forest, is a unit of the national park system. Here's what the Forest Service told FERC. It said the... Sorry, I'm trying to get my fingers on it. The Forest Service told FERC that the Appalachian Trail, as it crosses the national park system, is a unit of the national park system along its entire length. Sorry, it says the national park system is the lead federal administrative agency for the entire AT regardless of land ownership. That's in the JA at page 3611. That's the FDIS. It came out and said, Forest Service acquired lands are not considered to be part of the park unit as a unit of the national park system. The National Park Service objected to that and said, you got that wrong. It said the trail is one of three national trails administered by the National Park Service that are considered to be units of the national park system. Park Service administers the entire national trail and as such considers the entire trail corridor to be part of the ANST park unit. That's the only question to be answered. If you answer that question in the affirmative, this is a unit of the national park system as it crosses the George Washington National Forest, then we have the problem you pointed out, Judge Winn. Two agencies looking at the exact same statute. One the courts already looked at and said exists in a different sphere from units of the national park system and citing it as authority for this right of way. That's one of the issues that are not squarely addressed by the Sierra Club decision, Your Honor. The other relates to landslides. This pipeline will cross rugged terrain in the national forest for the same reason that erosion is a concern across the national forest, landslides are as well. The Forest Service has had landslide problems and slope stability problems with its ordinary projects, road building, logging projects, and smaller pipelines. For that reason, it demanded validation that this could be done without causing landslide problems. Atlantic's answer to this was a best-in-class, what it calls its best-in-class program. Can you tell the difference between landslides and erosion? How fast it happens, Your Honor. Erosion is the... Treated them differently, though. Yeah, we did. One erosion was here, a landslide, and I said, for me to be the same thing. They're very much related, Your Honor. That's the same cause. Unstable soils, unstable geology, and lots of precipitation. The difference is a landslide is a mass movement of soil all at once and can have significant consequences. While this case was pending, while briefing was going on, a landslide in West Virginia on similar terrain caused an explosion of the Columbia Gas National Pipeline. It's in the EIS. That pipeline is in the EIS, cited by FERC as an example of why pipelines can be built without problems in this terrain. This best-in-class approach that Atlantic took, the Forest Service described as a cookbook with generalities. They identified ten classes of hazards and said, when we get out in the field, we're going to pick from this recipe book to solve it. The Forest Service said, give us... They picked ten examples and said, give us concrete, site-specific designs to show this will work for each one of those hazard classes. It never got them. It demanded them nine times. It submitted an official letter to FERC saying it needed, saying it couldn't analyze plan amendments or environmental effects without them, and Atlantic simply refused. Ultimately, the agency reversed. So you're saying we could make two different determinations. We could say the Forest Service acted arbitrary and capriciously with regard to failing to take the requisite hard look at the landslide, and we could make a determination, well, it did so, insofar as erosion, because they're treated differently here. I think that's right, Your Honor, and with distinct errors. That's exactly right. So one is looking at precipitation and the rate of erosion, which even under the wildly optimistic estimates that they relied on, is going to increase by 200 to 800 percent in the project. The landslides, you know, massive tons of soil moving at the same time. Okay, thank you. If that answers your questions, I'll save the rest of my time for rebuttal. All right, thank you. Good morning, and may it please the Court. Avi Kupfer for the Federal Respondents. I'd like to begin by adding just a little bit of context to this case. Do this for us. Tell us how much we got to decide, because apparently Sierra Club, some of this is decided. I don't know how much you may disagree on, but you've got to agree something is decided by Sierra Club, as Judge Thacker observed from the beginning. Well, as you can imagine... Your opponent says there are three right off the bat, and he leaves two more. Which of those don't you agree with? As you can imagine, we disagree with all of those. The first is in regard... I'll begin where they began, which is in regard to their contention that these two forest plan amendments are directly related to substantive planning provisions in the 2012 planning rule. Even if they're right and we're wrong... Which was an issue in Sierra Club. Right, but one issue that wasn't reached in Sierra Club was the harmless error issue. So, taking a step back, even if they're right, we're wrong, let's say those amendments are directly related. Any error was harmless, because the error was a technical one. Forest Service stated the wrong rationale. Forest Service didn't fail to protect any resource that they are required to protect under those substantive planning provisions. If you go to the actual regulation, 36 CFR 219.8, what it requires is that when an amendment is directly related, the Forest Service must include provisions in the amendment that maintain or restore soils, and maintain or restore riparian areas. Here, if you look at every one of the modified provisions that the petitioner has challenged, there are measures in those provisions to maintain or restore soils and riparian areas. And this is how the Forest Service does that. They incorporate... So, is that in the record of decisions somewhere? It is. It's on pages 20 through, I think it's 19 through 22, roughly there in the record. If you look at the modified language, the Forest Service incorporates the ROD and the COM plan into those modified provisions by reference. And they require that Atlantic applies the applicable mitigation measures from the ROD and the COM plan, which maintain and restore soils and riparian areas. Let me give you an example. One of the modified standards, George Washington Forestwide Standard 5, requires that projects disturb no more than 15% of the soil in an activity area. They modified that standard here, allowing Atlantic to disturb more than 15% of the soil in this activity area. But they also, in so doing, they also required Atlantic to comply with a robust set of measures to maintain that soil. Atlantic has to complete construction on a two-week sequence in order to minimize harm to steep slopes. They have to regrade the contours of those slopes immediately. They have to apply soil conditioning amendments selected by the Forest Service, install permanent erosion controls in specific locations and of specific types that have been selected by the Forest Service. This sounds all well and good, but are we in a position to exact that kind of expertise in this case here? I mean, how in the world are we going to make a harmless determination with that kind of evidence that's necessary in order to show compliance with the 2012 rule? Well, you don't have to take my word for it, Your Honor. This is in the record. The Forest Service itself stated in the ROD that all of these measures in the ROD and the COM plan are intended to restore or maintain soils, restore or maintain riparian areas. That's exactly what these mitigation requirements were for. And so that it would be harmless? Where is that in the decision? That argument, so under the APA... That argument you came up with after Sierra. Right. Under the APA, this Court has a responsibility to consider whether any error was harmless. It's the APA's harmless error rule. So our contention is that even if the Forest Service errors were wrong, these are directly related amendments, any error was harmless because it was an error in stating the wrong rationale, not in failing to apply those protective measures to maintain or restore soils, riparian areas, because each of the modified provisions includes language requiring Atlantic to do exactly that. Why did you lower the standards? So we can get into that argument. You are here. You're here now. So why did you lower the standards? Our contention is that the standards weren't themselves lowered, but even if this Court says that they were... But you just said they were. It was more permissive. In some way, I think it depends how you frame it. Am I misinformed? Did you say they were more permissive than you said? But you said because we now have mitigating type measures, it's harmless, but you just said that the permissive standards were lower in terms of less restrictive. So that gets to the question... Am I correct about that? So that gets to the... So no, we do not think that's correct, Your Honor. But I think the key argument we're pressing is that even if that's right and the Forest Service erred in determining that these standards were directly related, that error was harmless because they complied with the provisions issued, which required the modified amendments include measures to maintain or restore soils and maintain or restore riparian areas. Well, that's in the future, right? What's going to happen in the future? That's the requirement under the substantive planning provision to include measures in the modified amendment. It's not about what will happen. It's about what the Forest Service did on the record. And what they did on this record is require Atlantic to abide by a robust set of mitigation measures to restore soils, to restore riparian areas that they negotiated. Over two and a half years of review, the Forest Service took its job here very seriously. They have a difficult role. Didn't you say the 2012 rules didn't apply? So our argument is that the 2012 substantive planning provisions do not apply to these particular amendments, but the main argument we're making is that even if they... Why not? Why don't they apply? So the arguments we made in our brief is that they are not directly related to these substantive requirements and that they will not have a substantial adverse effect on these resources. But again, I think the main... How would you define substantial adverse effect on a national forest? As the Forest Service stated... I mean, again, so the Forest Service explained in the rod. They went through all the analysis to look at whether the effect would be substantial. But the best guidance for that issue can be found in the preamble to the 2012 rule where the Forest Service says that rarely, if ever, will a project-specific amendment rise to the level of having a substantial adverse effect on these resources. I'd like to also address the contention by petitioners that the Forest Service lacks authority under the Mineral Leasing Act to issue this right of way. How can that be? Rarely, if ever, will something rise to have a substantial adverse effect on the forest? How many trees do you cut down before it's a substantial adverse effect? Maybe not one. Well, the Forest Service... All of them? The way the Forest Service stated in the 2012 preamble to that rule was that it was going to look at the impact of the resource over the entire forest. That's how the Forest Service... What about looking at alternative routes off national forest property? Your Honor, I'm sorry. Are you asking me to turn to the alternative issue? Yes. Okay. So we think that this case, in that regard, is on all fours with the Mountain Valley Pipeline Forest Service decision, where this court said that it was perfectly reasonable for the Forest Service to adopt the conclusions in the environmental impact statement. I think the key here is to look at the entire record and the fact that the Forest Service took its responsibility very seriously. When Atlantic initially applied to FER for a certificate of public convenience and necessity, they actually proposed a completely different route that would have gone through more of the national forest. And the Forest Service, as was its duty under the Natural Gas Act, pushed back against that and said that that route wouldn't be okay. They stated that in a letter in January 2016, and they said it impacts too much of the forest, especially since sensitive habitat for a threatened and endangered species. So Atlantic went back to the drawing board. Only then did FERC, once they resubmitted their application to FERC, did the Forest Service provide additional feedback. Then FERC took the feedback from the Forest Service and the other cooperating agencies. Over a year and a half of review, it analyzed 27 route alternatives, and it issued a certificate of public convenience and necessity, which is a key inflection point. Because at that point, FERC has selected one route and determined that the public convenience and necessity require a pipeline on that route. And once FERC made that choice, it narrowed the issue before the Forest Service. It was to consider this special use permit on the route approved by FERC, whether to grant it or to not grant it. And as this Court stated in the Mountain Valley Pipeline Forest Service case, and as the D.C. Circuit stated last year in the Capital Crescent Trail case, which is very similar to the situation here, that funneling approach, whereby the decision before the agency narrows over years of review, accords with NEPA's rule of reason and common sense. With my remaining time, I do just, I still want to understand your state, try to understand your statement before, that the Forest Service has stated that rarely, if ever, will a project rise to the level of causing substantial adverse effects. So on behalf of the Forest Service today, what would rise to the level of a substantial adverse effect to a national forest? Your Honor, that is not a specifically defined term in the regulation. Well, you said it's rarely, if ever. Well, that is the guidance that the Forest Service gave in the preamble to the 2012 rule. And I think the key here is that- It sounds like it could be the whole forest. We could leave one. Your Honor, even if you disagree with the Forest Service on that issue, the key is that if there was any error, it was harmless. It was a technical error in failing to state the correct rationale. It was not an error in failing to apply these substantive provisions. I would like to briefly address the contention that the Mineral Leasing Act does not give the Forest Service authority to issue a right-of-way underneath national forest system lands on the Appalachian Trail. I think that issue can be resolved because there is a key mistake that petitioners make in their reference to a national park system unit. That is not a defined legal term. It's convenient shorthand that the Park Service sometimes uses in referring to the outer boundaries of an area that contains national park system land, national forest system land, private land, state-owned land. It is not a defined legal term. The only legal terms that are relevant to this Court's consideration of this issue are national park system lands and national forest system lands. Those are the terms under the Mineral Leasing Act that determine whether an agency can authorize a right-of-way underneath federal lands. They can authorize a right-of-way underneath national forest system lands, that is, lands owned by the United States and managed by the Forest Service. The Appalachian Trail is 2,000 miles long. It contains federal lands, some are forest system lands, some are park system lands, private lands, state lands. The forest system lands actually comprise the majority of the federal lands in the Appalachian Trail, and there are already more than 50 pipelines running underneath the Appalachian Trail. This is not some newfangled idea that the Forest Service came up with. The Trails Act doesn't silently upend that system of federal land management. I seem I'm out of time, unless there are any further questions. Yes. Before you walk away, if you may help me understand, in looking at the FERC's plan, the EIS, the Forest Service had some concerns about that, didn't they? Correct? They did, Your Honor. Serious concerns, would you say? That's correct. And significant? Yes. But it was somehow adopted and approved in ROD without any explanation as to wouldn't the government make a reversion in that? When was that done? So I'll try to answer your question briefly, Your Honor. The key is that this is a much more robust record than in the Mountain Valley Pipeline case. The Forest Service did not simply adopt the environmental impact statement. It was conducting its How did you address your concerns that were documented? The Forest Service addressed those concerns by conducting its own additional review. The Forest Service reasoning is clearly laid out through a year and a half of back and forth with the Atlantic and FERC on the contours of the COMM plan. The Forest Service made revisions to those plans. Basically, what the Forest Service said was, for example, the model that Atlantic came up with. The Forest Service said, we agree that that is the best available model, but it has limitations. So we're going to continue on our own, independent of the environmental impact statement, to thoroughly analyze exactly what the impacts of this special use permit are. They conducted dozens of meetings. They submitted three rounds of substantial revisions to the COMM plan, and only at the end of that process, in October 2017, this is well after the environmental impact statement was finalized. Only then, and this is probably the most key document in the record at page 847, does the Forest Service send a letter to Atlantic where they say that, over this year's long review, you have finally addressed, you have largely addressed our concerns. The revisions you've made to the construction protocols and the mitigation measures address our concerns. Please adopt these 15 final pages of revisions to the COMM plan, and only then will our analysis be complete. So the short answer to your question, Chief Justice. Well, who's running the train station? Is it the private company or is it? You represent the United States government, correct? Your Honor, the Forest Service took its place. You can answer that question. I do. You do, don't you? And in that, you represent the people and the resources, the natural resources and the beauty that makes us see the signing sheet and all of the prairie and all those things. Why would you not make sure it's clear that you're addressing your concerns? It seems to me you do a contract, the time to hold a person's feet in the fire is when you're writing the contract, not making an agreement on the side or something and say, well, do your best to hear we can do that. Why would you seemingly lower the standards? And when was that done? Can you give me a time frame when you decided that we're going to go to them rather than to FERC in looking at these things? When was that done? Give me a temporal perspective. Sure. So. Month and year. I'm trying to answer all your questions. There's one right now, month and year. When did you make that shift? It wasn't a shift. These processes were occurring. Okay. That's okay. Those words are in your mind. When did you decide that your concerns could be allayed by someone else other than yourself protecting your own? With respect, Your Honor. When? Their concerns were. When? Your Honor, beginning in 2015, the Forest Service began its own review process. It didn't capitulate to Atlantic. They took this job very seriously. The Forest Service has to manage the National Forest for multiple uses and balance competing interests, which include protection of wildlife habitat, but also include a responsibility given to them by Congress to responsibly maintain and construct utility corridors. Over two-and-a-half years, the Forest Service made revisions to the route that it required FERC to adopt. It required Atlantic to make substantial changes to its construction plan and to include mitigation measures in that plan. And I think the best places in the record to look for that are the three rounds of edits they gave to Atlantic on the COM plan, the first in November 2016, another set in April 2016, and a final set of comments in October 2017. Wait, do you mean April 2017? Oh, yeah, sorry, April 2017. That's what I thought, not April 16. So basically it was in 2017 that you started to make these? It was in 2016 that they started to make these changes. Is the 96% efficiency rate for erosion control that the pipeline recommended initially, is it still in the final? That's in the final environmental impact statement, but what the Forest Service said The Forest Service really had objected to that. And those objections are recorded in the environmental impact statement itself. At pages 1663 and 1664 of the record, the EIS says what FERC did was they rejected the fact that the Forest Service said that model is not good enough. So when did the Forest Service decide it was good enough? They didn't. Okay, I thought you said it was in the final. The model itself is in the final EIS, but what the EIS says is that because that model isn't good enough for the service to conduct its thorough environmental analysis here, the Forest Service is going to need to continue to analyze this project, to make changes to the COM plan, to make significant revisions to these mitigation measures. Oftentimes a model is not going to be sufficient for an agency to conduct its thorough environmental analysis. Models limitations, and that's what the Forest Service recognized here. So you might need to go back and think about it some more. No, Your Honor. The Forest Service recognized the limitation in the model and relied on other issues in determining what the impacts of potential erosion and sedimentation on the forest would be. You didn't have to accept them, did you, FERCS, the things you had issue with? Did you have to accept them, the concerns you had with FERCS EIS? Well, they didn't accept the model in the EIS. If you look at pages 1663 and 1664 of the record, what that section of the EIS says is the Forest Service has some concerns. It can't complete its analysis of erosion and sedimentation in the forest until it is done, which is why the Forest Service was conducting its own independent analysis. And this is reflected in the rod at page 50 and 51 of the record. The Forest Service says our analysis here isn't reliant on the environmental impact statement alone. And this is the key difference between this case and the Mountain Valley Pipeline Forest Service case. It also relied on the substantial revisions it made to the COM plan. And as it made those revisions, it required Atlantic to include in that COM plan construction protocols and mitigation measures that were sufficient for the Forest Service to fully analyze what the impacts would be. That's why that October 3, 2017 letter at page 847 is so key. It was submitted to Atlantic several months after the final environmental impact statement, and that's the point at which the Forest Service said, you finally addressed most of our concerns. The language they use is your responses have largely addressed our concerns, but incorporate this final set, these 15 pages of Excel spreadsheet changes, into the COM plan before we're comfortable with what you're doing here. Thank you, Kevin. Thank you very much. Mr. Smith. Thank you, Honors. Brooke Smith for Atlantic Coast Pipeline. Let me cut to the quick. I want to point to specific record evidence where the Forest Service's concerns were resolved, not simply by acquiescence, but rather through strict mandatory requirements on Atlantic Coast Pipeline. Judge Sacker mentioned the sediment modeling analysis. That's an issue of apparent commonality with the MVP decision. The Forest Service never accepted the 96% efficiency. Indeed, that model was predicated on a standard erosion sediment control device called a silt fence. Instead of debating, as it did in the other proceeding, over the percent effectiveness of the silt fence, the Forest Service made a much more direct and compelling move, which was to prohibit the use of silt fences in the areas over which it had concern, areas of concentrated overland flow, whether natural or manmade, which would represent the steep mountainous terrain through which portions of Atlantic Coast Pipeline cross. That is reflected in the record that is noticeably absent from petitioner's briefing. It doesn't end in May. It begins after May. Indeed, those comments prohibiting the use of silt fences came to Atlantic and were responded to Atlantic on June 30th, it's JA 1886, and resulted in the Forest Service's response, which you've heard from Mr. Kupfer in October of 2017, JA 00847, and ultimately Atlantic's final comp plan from October of 2017, in which Atlantic committed not to use the silt fences that were the subject of the overly optimistic erosion sediment modeling. It is that type of record evidence in our case that shows that the agency not only took a hard look but clearly did not acquiesce to applicant submittals. Indeed, the issue of removal efficiency for silt fences was raised not less than five times in the Forest Service's direction to Atlantic not to use these silt fences in areas where they were not proven to be effective. That's the type of record evidence that we submit goes not just to the hard look analysis under NEPA but also, importantly, for forest planning rule purposes. The directly related test gets you to the substantive question of what- Now the Forest Service had requested ten site-specific steep slope designs. How many of those did you provide? Your Honor, this is another great example. Two were provided before the record of decision. The remaining eight were required as a strict mandatory term and condition for the record of decision and the special use permit. So you're working on those now? Yes. In fact, seven of the eight have been submitted and approved. Let me explain the back and forth that led to that. There was a year of analysis, six sets of written comments, and at least 11 meetings on those first two. The focus of those first two was did they reflect the consummation of reasoned and technical decision making that would give the Forest Service confidence that in these areas of slope-prone landslide risk that these plans would abate that risk. Once the Forest Service was satisfied that those first two plans were exemplars of the process, they then embedded as a mandatory requirement of the SUP and the ROD that Atlantic continue to do the remaining eight before construction began and as a condition to obtain review and approval by the Forest Service and consultation as necessary. So we submitted it. It's a bit of a mischaracterization of the record to suggest that the Forest Service walked away from a steep slope concern. Indeed, the consummation of the record reflects that the Forest Service never relented. It asked for 10 and it will get 10, and that's a mandatory requirement of the permit. My point was that this is not just part of the hard look analysis. The question is whether the Forest Service applied its substantive planning rule standards. Earlier the judges asked about whether this was to lessen plan standards for Atlantic Coast Pipeline. The reality reflected in the ROD is that for some of these standards, like soils, construction of a pipeline according to FERC-required procedures doesn't match up squarely with forest plan prescriptions, percent soil removal or how much soil has to be stockpiled or when you put it back. Those are things that are inconsistent between two federal agencies. So what Forest Service did within its discretion was to apply those standards within the scope and scale of the amendment, which is what the rule requires, and required equal or greater protections through the FERC-required procedures and plans and the comp plan, which is why these issues of erosion and sedimentation and landslide risks are so significant because the record shows that Atlantic was able to reach a decision with the Forest Service, was able to demonstrate compliance with strict mandatory conditions that would show that those concerns would be addressed and that the plan standards would be maintained or restored, which at the end of the day is what the Forest Service's obligation was. If I may, I will amplify one point on the Appalachian Trail Crossing, which is simply the bedrock principle of American property law, is that you have to have ownership in the land in order to convey an interest in land, like right-of-way or a special use permit. The Forest Service has always owned and administered the land being crossed. It has owned it and administered it far before 1968 when the National Trails Act was enacted by Congress, and there's nothing in the National Trails Act that converts National Forest System land like this to National Park System land simply by virtue of the fact that Congress saw fit to designate the Park Service as the overall administrator of the footpath. If you read the Trails Act, you will see that that nominal overall administration function ties to seven specific authorities in Section 1246 of the Act. They go to things like uses along the trail, like camps and shelters and park benches. It goes to coordination with all of those other agencies and private citizens that you heard from Mr. Kupfer that own some piece of this 2,000-mile footpath. It goes to rules adopting consistent use or consistent signage. Those are administrative functions. The National Park Service is an administrator of the footpath for purposes of those seven authorities. Congress was equally clear that it did not take away or transfer from other federal agencies with interest in that footpath their administration functions, and that's why it's critically important when you look at the right-of-way section in 1248, it doesn't say the administrator or the secretary with overall administration for the park shall grant rights of way. It says the Secretary of the Interior or the Secretary of Agriculture, as the case may be. That's precisely the case here, which is why we think they had authority to grant the right of way. Thank you, Your Honors. Thank you so much. Thank you. Counsel, you have some time reserved. First, I think I can address quickly whether the question whether this court's decision in Sierra Club is in fact controlling with respect to the planned amendments. The Forest Service's brief concedes the purpose of the amendments was to relax 13 planning standards. You don't need to go any further than that to find that it is on all fours with the Sierra Club decision, which required the Forest Service to hold those amendments up to the planning rule. Counsel suggests they now distance themselves from the modeling analysis that animated the erosion and soil analysis because of the court's decision in Sierra Club, but they can't do that because we've pointed to the problem, the symptom, the 96% number, but that model permeates the entire decision. It's cited in the record of decision at page 25. That's the model that predicted 200 to 800% increase in erosion. That's the wildly conservative number based on the wildly optimistic performance of those erosion control measures. So at the very least, the agency needs to go back and do a thorough job and consider whether it can amend these plans under its planning rule in light of what should be a much higher predicted erosion. With respect to the Mineral Leasing Act, the Forest Service asserts that, ignore the record, that's everywhere it says all the agencies agree. This is a unit of the national park system, even on the national forest system lands. This is a straightforward application of plain text interpretation of the statutes. The National Trails Act says, and they're right, unit is not a defined legal term, unit of the national park system. What is, is administration. Since 1916, the national park system has been defined by land administered by the Secretary of Interior through the National Park Service. They came along later in the National Trails Act, and they designated a lot of national trails. Some are administered by the Forest Service. This one is administered, that's the word of the statute, administered by the National Park Service. Congress knew what it was doing when it used the word administered. All the parties agree there's a difference between administering and managing. You hear counsel go back and forth between the two words. Forest Service manages the land and administers. But as a statutory definition, the administrator of this land is the National Park Service, and that's not just an accident of wording. It's what Congress meant to do. Designating something part of the national park system is a recognition of value. It's a stamp, a congressionally designated stamp, that this is a higher value land managed for conservation and recreation values. In the Mineral Leasing Act later, Congress reached out and grabbed that label. When it identified lands that are not suitable for oil and gas pipelines, lands administered by the national park system, that was a choice. What the Mineral Leasing Act actually says is agency heads can authorize right-of-ways across federal lands. It defines both terms. They could have said agency heads except the National Park Service can authorize rights-of-way. What they said instead was agency heads can authorize right-of-ways across federal lands except lands in the national park system. They used the broadest possible definition. It's a straightforward application of what the statute says. Judge Gregory, to your question about the date and the year where all of this turned, it's December of 2016. We cited you an email from the Deputy Chief of the Forest Service to the decision makers on this project. I thought it was. I thought it was a clear time, but go ahead. It took a while to get to it, and if we did, ever. Yes, Your Honor. In which they said, in which the Deputy Forest Service. Was it the JA site for the letter you're talking about? If you'll give me one moment, Your Honor, I can lay my finger on it. But in which the Forest Service Deputy Chief says, we're going to approve the pipeline on Atlantic's timeline, and we're going to do it on their preferred alternative. I expect that decision to come down as soon as January. All right. I'm sorry, Your Honor. I can't put my finger on this at the moment. I know. And finally, for this issue about alternatives, the fundamental problem, at least a cursory problem that puts us squarely within the scope of Sierra Club, in our client's favor, not decided against us, is that the Forest Service here has an independent binding statutory obligation to determine whether routes off of the forest can be accommodated or reasonably met off of the forest, in the same way that Bureau of Land Management had an obligation to determine whether it's practical to collate. They didn't co-locate with existing right-of-way. They didn't even purport to apply that standard. Forest Service admits in its brief that you can't find it. You can't find reference to that standard in the record of decision, and asks you to look instead for more general statements of purpose and practicality. They didn't ask the question. They completely bypassed it. And this is a binding legal requirement, just as it was in the Bureau of Land Management, controlled by this Court's decision in Sierra Club. Unless you have other questions for me. Thank you, Counsel. Thank you, Your Honor.
judges: Roger L. Gregory, James A. Wynn Jr., Stephanie D. Thacker